IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AVS FOUNDATION and PITTSBURGH
STEELERS, LLC,

          Plaintiffs,

v.                                      No. 11 CV 01084
**ELECTRONICALLY FILED**

EUGENE BERRY ENTERPRISE, LLC
and EUGENE BERRY

          Defendants.

MEMORANDUM OPINION

## *I.* *Introduction*

This is an action for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125. Currently before this Court is the Motion for Summary Judgment of the Plaintiffs, AVS Foundation and Pittsburgh Steelers, LLC (collectively hereinafter "Plaintiffs"). Doc. No. 29. The Court has reviewed Plaintiffs' Motion for Summary Judgment, the memorandum of law in support (Doc. No. 30), the parties' concise statements of the facts (Doc. Nos. 31 and 48), Defendants' Brief in Opposition to the Motion for Summary Judgment (Doc. No. 47), Plaintiffs' Reply thereto (Doc. No. 50), Defendants' Brief in Opposition (Doc. No. 58), and Plaintiffs' Reply Brief thereto (Doc. No. 61). For the reasons set forth below, the Court will grant Plaintiffs' Motion for Summary Judgment in its entirety.

## *II.* *Factual Background*

The following facts are material and undisputed unless otherwise indicated herein.

For approximately the past 35 years, "The Terrible Towel®" has been a symbol used by Pittsburgh Steelers fans. The famous Pittsburgh sports writer and Pittsburgh Steelers football broadcasting personality, Myron Cope, first owned the trademarks for "The Terrible Towel®"

products, and subsequently these trademarks were given to the Allegheny Valley School Foundation ("Foundation"). Plaintiffs in this case are the Foundation, which is a Pennsylvania non-profit corporation and a 501(c)(3) charitable organization, and the Pittsburgh Steelers ("Steelers"), a Pennsylvania limited liability company that has had exclusive right to market and sell items bearing the Foundations trademarks.[1] Since May 13, 2008, the Foundation has been the sole and exclusive owner of the registered federal trademarks "The Terrible$^{TM}$" and "The Terrible Towel®."[2] In addition, since May 13, 2008, the Foundation has been using "A Pittsburgh Original" in black and gold color palate on their products by prominently featuring it on the merchandise with one of the Foundation trademarks.

On May 13, 2011, Defendant, Eugene Berry Enterprise ("Enterprise") filed its application to register as a trademark, "THE TERRIBLE T-SHIRT," with the United States Patent and Trademark Office. On June 15, 2011, the Foundation's legal counsel wrote to Enterprise's attorney to inform it of the Foundation's trademarks and stated the Foundation's intent to oppose the application with a request for Enterprise to withdraw its application. However, despite the aforementioned request by Foundation, sometime during the week of August 15, 2011, Defendant asked National Retail Graphics to print tee shirts emblazoned with the words "THE

---

[1] The Foundation uses the proceeds raised through the sale of trademarked merchandise to support the Allegheny Valley School, a Pennsylvania nonprofit corporation and 501(c)(3) charitable organization that provides homes, residential care and habilitative services to intellectually and developmentally disabled persons.

[2] These trademarked items include: "The Terrible Towel®"; "Myron Cope's Official The Terrible Towel®"; "Myron Cope's Official The Terrible Toddler Towel®"; "Myron Cope's Official The Terrible Towel®" Apron; "Myron Cope's Official The Terrible Toddler Towel®" Bib; "Myron Cope's Official The Terrible Towel®" Cloth Vehicle Flag; "Myron Cope's Official The Terrible Towel®" Floor Mats; "Myron Cope's Official The Terrible Towel®" Footballs; "Myron Cope's Official The Terrible Towel®" Gloves; "Myron Cope's Official The Terrible Towel®" Non-Textile Wall Hangings; "Myron Cope's Official The Terrible Towel®" Pillows; and "Myron Cope's Official The Terrible Tote®."

TERRIBLE T-SHIRT A PITTSBURGH ORIGINAL" in a black and gold color palate. Before filling the order, Mark Cornman ("Cornman"), an employee of national Retail Graphics, indicated to Defendant, Eugene Berry ("Berry"), the sole officer and member of Enterprise, that he was familiar with the "The Terrible Towel®" trademark of the Foundation and asked Berry if he had any relation to the Foundation.

In response, Plaintiffs allege that Defendants brought to National Retail Graphics a letter purporting to be from the Foundation that gave Defendants authority to produce and sell the aforementioned tee shirt, which Plaintiffs claim is fraudulent because Defendants did not have permission to use the mark. Acting on the belief that the letter was authentic, National Retail Graphics produced the t-shirts for Defendants, which Defendants subsequently began to sell.

Defendants claim that the letter was a proposal and that Mr. Mark Cornman (hereinafter "Cornman") who would get permission from the Foundation for Defendants because he had worked with the Foundation in the past. Defendants did not allege that they received a letter back from the Foundation with regards to permission to use the Foundations mark on a tee shirt, before they sold the shirts.

### III.    *Legal Standard*

Summary judgment should be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). Further, a material fact is "genuine" where, "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding

whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

The threshold inquiry is whether there are, "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Once the moving party has properly supported its showing that there is no triable issue of fact and demonstrated an entitlement to judgment as a matter of law, then the non-moving party, "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586. In order to accomplish this the non-moving party must, "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, Section (d) of Rule 56 states that, "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declaration or to take discovery; or (3) issue any other appropriate order."

Here, Defendants claim that they are entitled to further discovery prior to a ruling on the Motion for Summary judgment because there are still unresolved issues of genuine fact. However, in viewing all the evidence before the Court in the light most favorable to the Defendants, no discovery will change the disposition of any genuine fact.

Therefore, it is proper for the Court to consider Plaintiffs' Motion for Summary Judgment in light of the facts currently presented and determine whether the movant must prevail as a matter of law.

## IV.    *Discussion*

Defendants contend that Plaintiffs' Motion for Summary Judgment is premature because more discovery is necessary. Doc. No. 58. However, Defendants have had ample time to seek discovery (or at least commence discovery); and nothing on the record (by way of affidavit or otherwise) indicates that any discovery has occurred. On September 20, 2011, the Court entered a Case Management Order (hereinafter "CMO"), which gave the parties the standard 150 days to complete fact discovery to include: all interrogatories, depositions, requests of admissions, and requests for production. Doc. No. 27. Also addressed in the CMO is Federal Rule of Civil Procedure 26(a)(1), which requires that parties exchange all non-exempt relevant information within fourteen (14) days of the initial case management conference. This initial exchange within fourteen (14) days presumably occurred on schedule, or at least no motion has been filed with the Court to compel said disclosure, for failure to comply with Rule 26(a)(1).

Further, on November 30, 2011, Defendants, through their third attorney, admit in their supplemental memorandum of law in opposition to Plaintiffs' Motion for Summary Judgment that, "as of the current date, no discovery has been conducted." Doc. No. 58, page 2. Thus, as of the filing of Defendants' supplemental memorandum of law, seventy-seven (77) days have passed with no discovery requests, communication of interrogatories, notice of depositions or motions to compel being undertaken. And, as of the filing of this Memorandum Opinion, the record remains void regarding any discovery efforts by Defendants.

Additionally, a party who files a F.R.C.P. Rule 56(d) motion must establish that the information that would preclude summary judgment exists. However, even if further discovery were permitted in this case, Defendants have failed to establish in their affidavit any specific material fact that would preclude summary judgment. Doc. No. 58-1. The generalities listed by

the Defendants do not rise to the standard necessary to preclude summary judgment because, "one who resists summary judgment but does not contradict the operative facts in his adversary's affidavit must utilize discovery, and suspicion alone without discovery is not enough." *Robin Construction Co. v. U.S.*, 345 F.2d 610, 614 (3d Cir. 1965). Therefore, it is proper to consider the pending Motion for Summary Judgment because sufficient uncontested facts are before the Court and ample time has been given to Defendants' for discovery.

In addressing the Motion for Summary Judgment, Plaintiffs contend that Defendants violated trademark law by creating t-shirts for the start of the 2011-2012 NFL that read, "The Terrible T-shirt A PITTSBURGH ORIGINAL." The Lanham Act, 15 U.S.C. § 1125(a)(1) provides in relevant part that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Thus, trademark infringement under the Lanham Act is established, and relief by the Court, is proper where a plaintiff can prove that: "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fision Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994).

### A. The Trademark is Valid, Protectable & Owned by Plaintiffs

In looking to the first two elements of the three part test for trademark infringement of competing goods, the court is to determine if, "(1) the mark is valid and legally protectable and

6

(2) the mark is owned by the plaintiff." *Fision Horticulture*, 30 F.3d at 472. In addressing this issue, the United States Court of Appeals for the Third Circuit has determined that a mark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years subsequent to registration, that there is no pending proceeding contesting the owner's rights to registration, and that there has been no adverse decision concerning the registrant's ownership or right to registration. *Id*.

Here, Plaintiffs have filed affidavits with the Court stating that "The Terrible$^{TM}$" has been a registered trademark and in continuous use for more than twenty consecutive years, that there are no pending proceeding contesting the owner's rights to the trademark's registration, and that there has been no adverse decision concerning the Foundation's ownership or right to registered trademark. Therefore, the "The Terrible$^{TM}$" trademark is presumed to have met the first two elements of the trademark infringement test for non-competing goods.

### B. Defendants' Use of the Mark is Likely to Create Confusion

In analyzing the third prong, the United States Court of Appeals for the Third Circuit requires that the District Court determine that a defendant's use of the registered mark to identify goods or services is likely to created confusion amongst reasonable persons of the general public concerning the origin of the goods or services. *See Checkpoint System, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 279 (3d Cir. 2001); *also Sabinsa Corporation v. Creative Compounds, LLC*, 609 F.3d 175 (3d Cir. 2010). In order to establish the likelihood of confusion of marks, a court is to consider the following ten factors set forth by the United States Third Circuit Court of Appeals:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence

of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods though not competing, are marketed through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendants market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983); *citing to Scott Paper Company v. Scott's Liquid God, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978). The ten factors are discussed below in the appropriate order based on the uncontested, genuine facts established for this motion for summary judgment.

### *1. The Strength of the Foundation's Mark*

The most substantial trademark protection is provided to marks involving arbitrary or fanciful terms that are inherently distinctive as opposed to generic names that function as the common descriptive name of a product class or descriptive terms that forthwith convey an immediate idea of the ingredients, qualities or characteristics of the goods. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986). Arbitrary or fanciful terms bearing no logical or suggestive relation to the actual characteristics of the goods and suggestive terms, which merely suggest rather than describe the characteristics of the goods both are "automatically protectable" types of marks under common law trademark law even where not registered. *Id*. at 297.

An increased level of trademark protection is provided to a "famous mark" as the term is used in the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c)(1). A famous mark is protected under the Act from any use of the mark in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. A mark is defined as "famous" under the Act where:

8

> [I]t is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following: (i) the duration, extent and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; [and] (iv) Whether the mark was registered . . . .

15 U.S.C. § 1125(c)(2)(A). "The degree of acquired or inherent distinctiveness of a mark bears directly upon the issue of whether that mark is famous." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC.*, 212 F.3d 157, 166 (3d Cir. 2000).

Plaintiffs marks illustrate the characteristics of both a fanciful, distinctive mark and of a famous mark. Like the mark "Kodak" for camera products and "Lifesavers" for candy, the Plaintiffs' marks do not describe the products to which they apply except for the meaningful relationship cultivated over time that inextricably connects them and gives them popular meaning, especially in the Greater Pittsburgh area. In the case of the Foundation's marks, the meaning is due solely to the advertising and publicity efforts first of Myron Cope and then Allegheny Valley School and the Foundation. More particularly, due to more than 35 years of use of first The Terrible Towel® mark and then the other related marks in connection with the Pittsburgh Steelers professional football team; the Foundation's marks visibility to fans viewing Pittsburgh Steelers football games in person and on television (such games regularly being televised on national television with several of the games through the years being among the most watched television programs in American television history); media articles about "The Terrible Towel®" and what it means and represents; the distribution through numerous channels of commerce; and the stature of Pittsburgh sports writer and Steelers broadcaster, Myron Cope, who conceived the idea of "The Terrible Towel®" and was responsible for conveying ownership

9

of the idea to the Foundation; the Foundation's marks have become widely recognized by the general consuming public of the United States as a designation on goods originating from a single source, namely Myron Cope's intended owner and beneficiary of the Marks, the Foundation. Wikipedia, The Free Encyclopedia, "Terrible Towel", http://en.wikipedia.org/wiki/Terrible_Towel (last modified 28 November 2011).

This Court also takes judicial notice of the marks' fame and notoriety as a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In similar cases, courts have taken judicial notice of a trademark's fame where such fame can be readily and accurately determined. *See, e.g. B.V.D Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988). The Foundation's Marks clearly warrant such judicial notice. As an example of the Foundation's Marks readily determinable fame, the Wikipedia Free Internet Encyclopedia devotes six pages to the "Terrible Towel®" noting that it has been taken to the peak of Mount Everest and into space on the International Space Station and that "it is clearly the most famous sports rally towel in use." Wikipedia, *supra*.

### 2. *Degree of Similarity Between the Marks*

Where marks share an identical dominant word, this alone is strong evidence of likelihood of confusion. *American Plan Corp. v. State Loan & Finance Corp.*, 365 F.2d 635, 639 (3d Cir. 1966), *See American Steel Foundries v. Robertson*, 269 U.S. 372, 381 (1926). The court can weigh whether the combination of words, devices or symbols making up the challenged mark are being used to deceive the public into believing that the goods of the infringer originated with the plaintiff. *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451

10

F.Supp. 555, 560-61 (S.D. NY 1978)(concerning an action arising under the Lanham Act, 15 U.S.C. § 1125).

A black and gold tee shirt with the words "The Terrible T-Shirt A Pittsburgh Original" is strikingly similar to Plaintiffs' marks. This utilization of the word "Terrible" along with similar coloring and a reference to "A Pittsburgh Original" is an apparent attempt to create confusion as to the tee shirts' source.

### *3-4. Evidence of Actual Confusion and Length of Time Defendants Have Used the Mark Without Evidence of Confusion*

"Actual confusion is potent evidence of the likelihood of confusion." *Gideons International, Inc. v. Gideon 300 Ministries, Inc.*, 94 F.Supp.2d 566, 584 (W.D.Pa 1999). In the context of determining if there is evidence from which a factfinder could conclude actual confusion, the United States Court of Appeals for the Third Circuit has noted that, "[a]lthough only likelihood of confusion, and not actual confusion, is required by the Lanham Act, actual confusion usually implies a likelihood of confusion. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 203 (3d Cir. 1999). Actual confusion in this case is demonstrated by The National Retail Graphic's employee, Cornman, immediately questioning Berry concerning his connection with Allegheny Valley School when Berry attempted to have the tee shirts produced by National Retail Graphics. See Declaration of Mark Cornman, Doc Nos. 2-3.

### *5. The Intent of Defendants In Adopting the Mark*

In analyzing the intent of a defendant, courts are to consider: (1) whether the defendant chose the mark to intentionally confuse consumers in order to capitalize on the senior mark's goodwill; and (2) the due care used by a defendant in investigating his mark prior to adopting it. *Sabinsa*, 609 F.3d at 187. In considering the tee shirt logo and design, Defendants' attempted to use the success and reputation of the Plaintiffs' products by creating the impression that

11

Defendants' tee shirts contain an authorized version of the Plaintiff's marks. Also, while it is contested that Defendants' fraudulently produced a letter purporting to be from Plaintiffs' to Cornman at National Retail Graphics; it is undisputed that Defendants' began to sell the tee shirt without receiving any specific approval in writing and knowing that the targeted market of Pittsburgh Steelers fans might view this as a authorized product. See Declaration of Mark Cornman, Doc No. 2-3. Finally, Defendants' intent can also be evidenced by ignoring the Foundation's challenge to their attempt to register the tee shirt mark.

### 6. *The Price of the Goods and Care & Attention Expected of Consumers When Purchasing*

Products such as bibs, towels, etc. featuring one of the Foundation's marks by their nature do not require a substantial financial investment by the purchaser. Accordingly, like many purchases, it does not represent a type of purchase for which the consumer can be expected to exercise great care and/or attention. Under such facts, it can reasonably be presumed that any black and gold, low cost cloth item featuring one of the Foundation's Marks or any substantially similar mark would be assumed by the average consumer to be one of the Foundation's products in that line.

### 7-10. *Channels of Trade and Advertisement; Extent That Sales Targets are the Same; The Relationship of the Goods in the Mind of the Public; and Similarity of Market Area*

The parties' advertising and marketing targets are the same customers (*i.e.* Pittsburgh Steelers fans looking for items with one of the Foundation's marks featured thereon, so that they can show their support for the football team). Where similar customers are similarly targeted, the likelihood of confusion between marks is substantially increased. *Sabinsa Corp.* 609 F.3d at 188. Defendants timed their attempt to produce and sell tee shirts with the start of the 2011 NFL

season, which would insure maximum financial gain on their part because sales are particularly high for Steelers merchandise at that time. See Declaration of Timothy Carey, Doc No. 16.

After consideration of the aforementioned three elements set forth in the Lanham Act and the ten factors in the *Lapp Test*, it is determined that Plaintiffs' are entitled to summary judgment.

## V. *Conclusion*

Accordingly, for the reasons set forth in this Memorandum Opinion, Plaintiffs' Motion for Summary Judgment (Doc. No. 29) will be granted.

An appropriate Order follows.

s/ Arthur J. Schwab  
Arthur J. Schwab  
United States District Judge

cc:     All Registered ECF Counsel and Parties